# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00020-COA

**TRAVON BROWN A/K/A TRAVON J. BROWN**  **APPELLANT**
**A/K/A TRAVON DEANGELO BROWN A/K/A**
**TRAVON D. BROWN**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/07/2013 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF TWO COUNTS OF MURDER AND SENTENCED ON EACH COUNT TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE SENTENCES TO RUN CONSECUTIVELY |
| DISPOSITION: | AFFIRMED - 11/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE AND JAMES, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1. On September 28, 2011, Travon Brown shot and killed Cornelius Harris and Felicia Ruffin. A jury trial was held in the Lee County Circuit Court on November 4 through November 7, 2013, and Brown was found guilty of two counts of deliberate-design murder. He was sentenced to serve two terms of life imprisonment in the custody of the Mississippi

Department of Corrections (MDOC), with the terms running consecutively. After the trial, Brown filed a motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial, and the motion was denied. Aggrieved, Brown appeals to this Court.

**FACTS**

¶2. On September 28, 2011, Brown shot and killed Harris and Ruffin at their home. At the time of the shooting, Harris's cousin, Dexter Babbitt, was sitting in his car at his house across the street. Upon hearing the shots, Babbitt called 911 at 11:42 p.m., and officers from the Tupelo Police Department responded. When the officers arrived at the residence, they found Ruffin deceased, sitting on the couch holding a book, with her head tilted back. At trial, one of the police officers testified that it looked as though Ruffin had been shot while turning a page of her book. They also saw Harris lying on the floor in a large pool of blood.

¶3. The officers then entered a bathroom, where they found Brown lying in the bathtub with a gunshot wound to his left hand, a Bud Light Lime beer, a bottle of shampoo, and a .40-caliber Glock pistol. Brown's hand was wrapped in a blood-soaked towel. The officers asked Brown to show his hands. Brown complied and stated: "I didn't know if he was still here or not." He then admitted to the officers that the gun was his. Brown was taken into the living room, and an ambulance was called to treat his hand. Brown was taken to the hospital by ambulance for treatment.

¶4. After Brown left the residence, Detective Brandon Garrett from the Tupelo Police Department arrived at the crime scene shortly after midnight. He photographed and videoed the scene. He also collected DNA evidence, Brown's pistol, and six .40-caliber casings from

2

the floor throughout the living room. The pistol was a .40-caliber Glock 22, with one live round in the chamber and five live rounds in its fifteen-round magazine. The pistol was sent to the Mississippi Crime Lab for testing, and the police department was able to confirm that the pistol belonged to Brown after running its serial number. Detective Garrett photographed multiple bullet holes found in the living room and in the hallway. In addition, he collected a blood sample from the curtains that had fallen from the front door to the floor, and he sent it to a laboratory for DNA testing. Lastly, at the hospital, Detective Garrett took Brown's blue jeans, in which he found Brown's driver's license, three .40-caliber shell casings, a crack pipe, a pair of nail clippers, and an empty pack of cigarettes.

¶5. At trial, Mark Boackle was accepted as a firearms expert. He testified that the projectiles that were recovered from Ruffin and Harris and the recovered cartridge casings had been fired from Brown's pistol. Boackle further testified that the gun was a semiautomatic Glock pistol, and that it was magazine fed. He explained that each time the trigger is pulled, only one bullet is fired.

¶6. According to Brown's statement he gave to police, he was playing a football game with Harris on an Xbox. Brown stated that Harris became angry and threw his controller at Brown. Brown had his gun in his waistband when the two began "scuffling." Brown then recalled:

> [His] gun fell out of [his] pants as [he] was trying to get to the door. [He] picked the gun up and [Harris] rushed [him]. While [they] were scuffling [Brown's] gun went off several times. . . . When the scuffling stopped[,] [he] saw blood everywhere and both [Harris] and his girlfriend had been shot. . . . This was a complete accident. [He] did not intend to kill anyone.

3

¶7.    The State also called Telvis Ragin to testify.  On the night in question, Ragin testified that as he was walking home around 8:30 p.m., when he came in contact with Brown.  Ragin stated that Brown told him "he was going to kill someone," but he did not say who.  Brown then tried to sell Ragin an "automatic .40 cal."  Brown showed Ragin the gun, and Ragin identified the gun that had been entered into evidence as the same gun that Brown attempted to sell him.  Ragin signed a written statement, but he later recanted the statement and said that he had been involved in a conspiracy with Babbitt when he gave his statement to police.  At trial, Ragin testified that the reason he recanted his statement was that he had been in prison, and Brown had threatened him.

¶8.    Babbitt was also called to testify at trial.  He stated that he lived across the street from Harris, and at the time of the shooting, he was sitting in his car in his driveway.  Upon hearing the shots fired, he got out of the car and saw some "scuffling" through a big window at Harris's house.  He claimed that he saw Harris open the front door, but that Harris was jerked back inside by Brown, and Brown shot Harris in the head.  Babbitt called 911 and stayed on the phone with the dispatcher until he saw the police cars driving towards him.

¶9.    Following the trial, the jury found Brown guilty of two counts of deliberate-design murder.  Brown filed a motion for a JNOV, which was denied, and then appealed to this Court asserting the following errors: (1) the circuit court erred in refusing several jury instructions; (2) the circuit court erred in excluding evidence of Harris's and Ruffin's toxicology results; (3) the evidence was insufficient to support the jury's verdict, or in the alternative, the verdict was against the overwhelming weight of the evidence; and (4) Brown

4

received ineffective assistance of counsel.

## DISCUSSION

### I. Whether the circuit court erred in refusing several jury instructions.

¶10. When reviewing the refusal of a jury instruction, this Court "must consider not only the [refused] instruction but also all of the instructions which were given to ascertain if error lies in the refusal to give the requested instruction." *Ousley v. State*, 984 So. 2d 996, 1000 (¶15) (Miss. Ct. App. 2007) (citation omitted). "A [circuit] court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*. at (¶16) (quoting *Ladnier v. State*, 878 So. 2d 926, 931 (¶20) (Miss. 2004)).

### A. Jury Instruction D-8

¶11. Brown first argues that the circuit court erred in refusing jury instruction D-8. The proposed jury instruction read:

> The [c]ourt instructs the jury that a person who is not the initial aggressor and is not engaged in unlawful activity does not have a duty to retreat before using deadly force so long as the person is in a place where the person had the right to be.
>
> Accordingly, if you find that Travon Brown was not the initial aggressor and that Travon Brown had been invited into Cornelius Harris's home, then Brown had no duty to retreat or to attempt to retreat before using deadly force against Harris and Brown was entitled to stand his ground without losing his right to self-defense.

¶12. Brown maintains that this jury instruction was warranted because he alleges that he was not the initial aggressor. Brown claims that after he made a comment about Harris's girlfriend, Harris threw an Xbox controller at him. Then, he stated that his gun fell out of his

pants, and he was trying to keep the gun away from Harris. According to Brown, the gun

went off several times, and after the scuffle ended, he realized that Brown, Harris, and Ruffin

had all been shot.

¶13.    The circuit court refused this instruction on the ground that the evidence presented at

trial did not support it. We agree. In addition to the lack of evidentiary basis, we further find

that Brown's theory of self defense was covered elsewhere in other instructions.

Specifically, in instruction 5, the court instructed the jury:

> If you unanimously find that (1) Travon Brown had reasonable grounds to
> believe he was in actual, present, and urgent danger of death or some great
> bodily harm OR to believe that Cornelius Harris intended to kill the defendant
> or to do him some great bodily harm, and (2) Travon Brown had reasonable
> grounds to believe that there was imminent danger of such act being
> accomplished, and that (3) Travon Brown was not the initial aggressor, it is
> your sworn duty to return a verdict in favor of the defendant in Count I.

We find that, although no other jury instruction specifically used the words "stand your

ground," Brown's right to self-defense was fairly covered elsewhere. *See Spires v. State*,

10 So. 3d 477, 484 (¶29) (Miss. 2009).

### B.    Jury Instruction D-10

¶14.    Next, Brown argues that instruction D-10 should also have been given. Instruction

D-10 stated:

> The [c]ourt instructs the jury that you are not to judge the actions of
> Travon Brown in the cool, calm light of after-developed facts, but instead you
> are to judge his actions in the light of the circumstances confronting Travon
> Brown at the time as you believe from the evidence that those circumstances
> reasonably appeared to him on that occasion; and if you believe that under
> those circumstances it reasonably appeared to Travon Brown, at the instant that
> he took up a weapon, that Travon Brown then and there had reasonable ground
> to apprehend a design on the part of Cornelius Harris to kill Brown or to do

6

Brown some great personal injury, and there reasonably appeared to Brown to be imminent danger of such designs being accomplished; then Travon Brown was justified in anticipating an attack and using reasonable means to defend such attack; then you must find Travon Brown not guilty.

¶15. The State argues that this jury instruction was covered fairly elsewhere in instruction 5, which was given by the court. Again, we look at instruction 5, which reads in pertinent part:

> The court instructs the jury that the State has the duty to prove the defendant did not act justifiably in killing the victims. To make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn dury to return a verdict in favor of the defendant.
>
> If you unanimously find that (1) Travon Brown had reasonable grounds to believe he was in actual, present, and urgent danger of death or some great bodily harm OR to believe that Cornelius Harris intended to kill the defendant or to do him some great bodily harm, and (2) Travon Brown had reasonable grounds to believe that there was imminent danger of such act being accomplished, and that (3) Travon Brown was not the initial aggressor, it is your sworn duty to return a verdict in favor of the defendant in Count I.

¶16. We find that the information contained in instruction D-10 was fairly covered in instruction 5. Instruction D-10 was properly refused.

### C. Jury Instructions D-12 and D-13

¶17. Brown also argues that the circuit court erred in refusing jury instruction D-12. Instruction D-12 provided the following:

> The [c]ourt instructs the jury that if you believe from the evidence in

7

this case, or have a reasonable doubt that Felisha Ruffin or Cornelius Harris died as a result of a fatal shot that was fired through accident and misfortune at a time when Travon Brown had no unlawful intent toward Felisha Ruffin or Cornelius Harris, then the death of Felisha Ruffin and Cornelius Harris is deemed by the law to have been n [sic] excusable homicide and you must find Travon Brown not guilty.

¶18. The circuit court refused the instruction stating that "the [c]ourt is of the opinion that adequate instructions [were] given advancing the theory of defense by the defendant" and the instruction was adequately covered. We agree. In addition to be instructed as to the elements of the crime, the jury was instructed to find Brown guilty of the murder of Ruffin if they found that Brown, "without authority of law, did willfully, unlawfully, and with malice aforethought kill Felisha Ruffin by shooting her with the deliberate design to effect the death of Felisha Ruffin; and not as a result of accident or misfortune." Instruction D-12 was properly refused.

¶19. Brown also argues that the circuit court erred in refusing proffered instruction D-13, which provided:

> The [c]ourt instructs the jury that if you find from the evidence, or have a reasonable doubt therefrom, that Travon Brown, without any design or deliberation to cause the death of Felisha Ruffin or Cornelius Harris, had possession of a pistol and in the heat of passion in a struggle between Travon Brown and Cornelius Harris the fatal shot to Felisha Ruffin or Cornelius Harris was fired accidentally and through misfortune upon any sudden and sufficient provocation, then it is your sworn duty to find Travon Brown not guilty.

¶20. Again, we find that the jury was properly instructed on the elements of the crime and Brown's theory of his defense. The instruction was properly refused.

### D.    Jury Instruction D-14

8

¶21. Finally, Brown requested that the court give instruction D-14, a *Weathersby* instruction. The instruction reads:

> The [c]ourt instructs that where the Defendant is the only eyewitness to the alleged homicide, his version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the prosecution, or by the physical facts or by the facts of common knowledge, and it is not enough to contradict that version in mere matters of detail which do not go to the controlling substance.

¶22. "The *Weathersby* rule is 'a statement of our general standards by which courts determine whether a directed verdict of acquittal is warranted.'" *Fryou v. State*, 987 So. 2d 461, 467 (¶34) (Miss. Ct. App. 2008) (quoting *Green v. State*, 631 So. 2d 167, 175 (Miss. 1994)). "Under *Weathersby*, 'the reasonable, uncontradicted story of the defendant or his witnesses must be accepted as true.'" *Id*. However, *Weathersby* does not apply when "the defendant's account is merely contradictory or if the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Id*. at (¶35).

¶23. We find that instruction D-14 was properly refused. The evidence presented at trial did not support Brown's account of the killings. Specifically, Detective Garrett testified at trial that Brown claimed that he and Harris had been playing Xbox in the living room. However, when he arrived at the house, there were Xbox controllers in the living room where the shooting had taken place, but the actual Xbox was unplugged in another room. Furthermore, Brown's testimony about how the shootings had occurred was contradicted by Babbitt's testimony at trial. As such, we find that instruction D-14 was properly refused.

**II.     Whether the circuit court abused its discretion in limiting the**

9

**testimony surrounding Harris's and Ruffin's toxicology results.**

¶24. At trial, Detective Garrett testified on cross-examination that he was aware of the toxicology test results of both Harris and Ruffin. Brown's counsel began asking questions regarding the results, and the circuit court sustained the State's objection. A hearing was held outside the presence of the jury regarding the relevancy of the results. The defense argued the fact that Harris had used cocaine within a few hours of his death supported Brown's contention that Harris was aggressive, unpredictable, and had impaired judgement. Similarly, the defense argued that Ruffin's use of cocaine, marijuana, and alcohol just prior to her death slowed her reaction time to the events taking place in Harris's living room.

¶25. "The admission of testimony is within the sound discretion of the [circuit] court." *Bell v. State*, 906 So. 2d 30, 32 (¶8) (Miss. Ct. App. 2004) (citing *Roberts v. Grafe Auto Co.*, 701 So. 2d 1093, 1098 (Miss. 1997)). We will not reverse such a ruling unless we find the decision was arbitrary and clearly erroneous. *Id.*

¶26. The circuit court found that whether or not Harris and Ruffin had used drugs was irrelevant as to the events that transpired on that evening. The court found that it would be "rank speculation" to imply that the drug use had any relevance to what occurred. We agree. There was no evidence in the record to support Brown's argument that Harris's and Ruffin's alleged drug use would have played any role in the shootings. This issue is without merit.

      **III.** **Whether the evidence was sufficient to support Brown's conviction for murder, or alternatively, whether the verdict was against the overwhelming weight of the evidence**.

¶27. At the conclusion of the State's case, the defense moved for a directed verdict on the

basis that the State had failed to prove all elements of deliberate-design murder. The circuit court denied the motion. On November, 12, 2013, Brown filed a motion for a JNOV, or alternatively, for a new trial. The motion was denied by the circuit court in an order dated December 19, 2013. On appeal, Brown argues that the overwhelming weight of the evidence shows that the shootings occurred as he was acting in reasonable self-defense or by accident or misfortune during a struggle with Harris. We disagree.

¶28. The same standard of review is used when reviewing motions for a directed verdict and a JNOV. *Nelson v. State*, 10 So. 3d 898, 905 (¶29) (Miss. 2009) (citation omitted). Both challenge the sufficiency of the evidence, and the Mississippi Supreme Court has held:

> To determine whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for [a] judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id*. (internal citations omitted) (quoting *Jones v. State*, 904 So. 2d 149, 153-54 (¶12) (Miss. 2005)). "The jury determines the weight and credibility to give witness testimony and other evidence." *Moore v. State*, 933 So. 2d 910, 922 (¶43) (Miss. 2006).

¶29. In this case, the jury heard multiple witnesses testify as to the evidence in this case and what happened in Harris's house on the night of the shootings. In addition, the jury was instructed as to the elements of deliberate-design murder, as well as self-defense with regard to Harris, and accident or misfortune with regard to Ruffin. The jury found Brown guilty of

11

deliberate-design murder as to both Harris and Ruffin.

¶30. "Deliberate[-]design murder consists of the killing of a human being without the authority of law by any means or in any manner when done with deliberate design to effect the death of the person killed, or of any human being." *Craft v. State*, 970 So. 2d 178, 183 (¶17) (Miss. Ct. App. 2007) (quoting Miss. Code Ann. § 97-3-19(1) (Rev. 2006)). "Deliberate design connotes a prior design to kill. Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before committing the fatal act." *Id*. (quoting *Blanks v. State*, 542 So. 2d 222, 226-27 (Miss. 1989)). "Deliberate design may be inferred from the circumstances, such as the use of a deadly weapon." *Id*.

¶31. We find that, after viewing the elements of the crime in the light most favorable to the prosecution, a rational trier of fact could most certainly have found the essential elements of the crime of deliberate-design murder. Brown went over to Harris's house with a gun, which according to Boackle's testimony could not have accidentally discharged nine bullets. In order for nine rounds to have been shot from Brown's semiautomatic Glock, the trigger must have been pulled nine times. In addition, a couple of hours before the shooting took place, Brown told Ragin he was going to kill someone. This issue is without merit.

¶32. In the alternative, Brown argues that the jury's verdict was against the overwhelming weight of the evidence. Brown maintains that the evidence established that he was guilty, at most, of manslaughter. When reviewing whether a jury verdict is against the overwhelming weight of the evidence, this Court accepts "as true the evidence presented as

12

supportive of the verdict, and we will disturb a jury verdict only when convinced that the circuit court has abused its discretion in failing to grant a new trial or if the final result will result in an unconscionable injustice." *Broadnax v. State*, 797 So. 2d 336, 338 (¶8) (Miss. Ct. App. 2001).

¶33. Based on the record before us, we find that the jury's verdict was supported by the evidence presented at trial. This issue is without merit.

### IV. Whether Brown received ineffective assistance of counsel.

¶34. Brown's final assertion is that he received ineffective assistance of counsel. Specifically, he claims that his attorney was deficient for the following: (1) failing to offer a manslaughter instruction; (2) failing to object to the State's improper comments during closing argument; and (3) failing to object to alleged instances of prosecutorial misconduct.

¶35. When reviewing a claim of ineffective assistance of counsel, we follow the test set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Hall v. State*, 735 So. 2d 1124, 1126-27 (¶5) (Miss. Ct. App. 1999) (citing *Wiley v. State*, 517 So. 2d 1373, 1377 (Miss. 1987)). "In order to prevail on a claim of ineffective assistance of counsel, [a defendant] has the burden of proof to show by a preponderance of the evidence that (1) counsel's performance was deficient, and (2) that the deficiency did, in fact, prejudice the defendant." *Moreno v. State*, 967 So. 2d 701, 703 (¶4) (Miss. Ct. App. 2007) (citation omitted). We evaluate counsel's performance by examining the totality of the circumstances. *Id*.

¶36. Upon review of the record before us, we see no indication that Brown was denied effective assistance of counsel. With regard to Brown's allegations, the Mississippi Supreme

13

Court has held: "When evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including whether or not to . . . make certain objections. Such decisions do not necessarily equate to ineffective assistance simply because counsel was not successful at trial." *Havard v. State*, 928 So. 2d 771, 790 (¶31) (Miss. 2006) (citation omitted). Brown's allegations are not adequately supported by evidence, and do not prove that his counsel's representation was deficient in any way. This issue is also without merit.

¶37. **THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT OF CONVICTION OF TWO COUNTS OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ON EACH COUNT, WITH THE SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, MAXWELL, FAIR AND WILSON, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**